Lexi J. Hazam (State Bar No. 224457)
lhazam@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Neal A. Roberts
nroberts@protectuslaw.com
PROTECTUS LAW
1025 Connecticut Avenue, NW Suite 1000
Washington, DC 20036
Telephone: (202) 810-1300

*Additional counsel listed on signature page*

*Attorneys for Plaintiff David Hemmer*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID HEMMER, individually and as parent and general guardian of his minor daughter M.H., | **COMPLAINT** |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| v. | Case No. 3:23-cv-55 |
| META PLATFORMS INC. and INSTAGRAM LLC, | |
| Defendants. | |

Plaintiff complains of Defendants as follows, based on his personal knowledge and on information and belief:

## INTRODUCTION

1.      Plaintiff David Hemmer ("Mr. Hemmer"), individually and as parent and general guardian of his minor daughter M.H., brings this action against Defendants Meta Platforms Inc. ("Meta") and its subsidiary Instagram LLC for injuries to M.H. caused by Defendants' product Instagram.

2.      "We make body image issues worse for one in three teen girls."[1] So said Meta's own researchers of Instagram in an internal slide presentation in 2019. The presentation was part of a trove of documents leaked by former Meta employee Frances Haugen to journalists at the *Wall Street Journal* and federal regulators in 2021. The *Journal*'s reporting on the documents beginning in September 2021 caused a national and international uproar.

3.      The documents confirmed what social scientists have long suspected: social media products like Instagram—and Instagram in particular—can cause serious harm to the mental and physical health of young users, especially to teenage girls like M.H. Worse, this capacity for harm is not accidental but by design: what makes Instagram a profitable enterprise for Meta is precisely what harms its young users.

4.      Instagram is popular in the United States and overseas, with roughly a billion active monthly users worldwide and roughly 160 million users in the United States. It is particularly popular among young people. Over 40% of Instagram's users are 22 years old and younger. About 22 million U.S. teenagers use Instagram daily. Meta makes money from products like Instagram by using them as advertising platforms, offering access to these vast and lucrative audiences to advertisers in exchange for roughly $70 billion annual advertising revenues in 2019. The success of this business model depends on Meta's ability to keep its users on its products (and thus exposed to its clients' advertising) for as long and as often as possible.

---

[1] Georgia Wells *et al.*, *Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show*, WALL STREET JOURNAL (Sept. 14, 2021), https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739.

5.      Instagram has numerous features designed to hook its users and maximize their "engagement" with Instagram. These features exploit the natural human desire for social interaction and the neurophysiology of the brain's reward systems to keep users endlessly scrolling, posting, "liking," commenting, and counting the number of "likes" and comments to their own posts. Young users' still-developing brains are particularly vulnerable to such exploitation.

6.      Once young users are hooked, according to the "Teen Mental Health Deep Dive" performed by Meta's researchers using survey data as well as data generated by its products, "[a]spects of Instagram exacerbate each other to create a perfect storm," that endangers young users' mental health. These aspects include specific design choices by Instagram, such as the "Explore" feature (which "serves users photos and videos curated by an algorithm" and "can send users deep into content that can be harmful") and "selfie filters" (which can "touch up" users' faces in their pictures), as well as patterns of common use that Instagram exploits through these design choices ("[t]he tendency to share only the best moments" and "a pressure to look perfect"). The researchers concluded that this "perfect storm" could contribute to eating disorders, unhealthy body image, and depression among teens.[2]

7.      The researchers found that "[s]ocial comparison," or peoples' assessment of their own value relative to that of others, is "worse on Instagram" for teens than on other social media platforms. One in five teens reported that Instagram "makes them feel worse about themselves." Roughly two in five teen users reported feeling "unattractive," while one in ten teen users reporting suicidal thoughts traced them to Instagram. Teens "consistently" and without prompting blamed Instagram "for increases in the rate of anxiety and depression." And though teens point to Instagram as a source of psychological harm, they often lack the self-control to use Instagram less. According to Meta's researchers, teens "often feel 'addicted' and know that what they're seeing is bad for their mental health but feel unable to stop themselves."[3]

---

[2] *Id.*

[3] *Id.*

8.      Despite this extensive research—and the public outcry generated by its disclosure—Meta has taken no meaningful steps to fix its harmful product or to warn Instagram's users or the public of its dangers. Instead, Meta only took steps it knew to be ineffective to burnish its public image. Meta tested whether hiding "likes" on users' content improved user well-being, and found it did not. Meta nevertheless implemented the change for no other reason than to give the public impression that "Instagram cares about its users." Likewise, Meta has produced a series of videos recommending daily affirmations that "I am in control of my experience on Instagram"—when Meta knows teens are precisely *not* in control of their Instagram use. By contrast, Meta declined to take steps that promised improvements to user well-being because it feared the improved product would lose its grip on its target users. For example, when researchers suggested "reduc[ing] exposure to celebrity content about fashion, beauty and relationships, while increasing exposure to content from close friends," the suggestion was rejected by executives arguing that Instagram, especially for teens, is "mostly about" comparing oneself to the "very photogenic," and that "competition" is the "fun part" of Instagram.[4]

9.      M.H. is one of the young women harmed by Instagram in just the ways Meta's researchers anticipated. Soon after starting to use Instagram, she was hooked; her use spiraled out of her control, injuring her self-image and self-esteem by a harmful barrage of images and videos that, among other things, expressly promoted eating disorders like anorexia. Before her fifteenth birthday, as a result of her compulsive Instagram use, M.H. was diagnosed by her physician with anorexia and a host of associated mental and physical symptoms. She continues to struggle with these conditions today. Mr. Hemmer brings this action on behalf of himself and M.H. to recover for these injuries to his daughter's mental and physical health caused by a product which Meta knew to be defective and dangerous to users like her.

## **PARTIES**

10.      Mr. Hemmer and M.H. are residents of Houghton, Michigan

11.      Mr. Hemmer brings this action on his own behalf and on behalf of M.H., as her parent and general guardian.

---

[4] *Id.*

12.     Mr. Hemmer is the real party in interest to this action under Federal Rules of Civil Procedure 17(a)(1)(C), (b)(3), and (c)(1)(A).

13.     Meta (from 2005 to 2021 known as Facebook Inc.) is a multinational technology company that designs, distributes, and promotes Instagram, among other applications.

14.     Instagram LLC is a subsidiary of Meta wholly owned and controlled by its parent. To the extent the allegations in this complaint against Meta relate to the Instagram product specifically, Mr. Hemmer realleges them in full against Instagram LLC as well.

## JURISDICTION

15.     The Court has subject matter jurisdiction of this case under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy requirement is satisfied.

16.     Mr. Hemmer and M.H. are citizens of Michigan under 28 U.S.C. § 1332(c)(2) because M.H. resides with him there and in his custody.

17.     Meta is a citizen of Delaware because it is incorporated there, and a citizen of California because its principal place of business is there.

18.     Instagram LLC is a citizen of Delaware and California because its only member is Meta, and Meta is a citizen of Delaware and California.

19.     The amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

## VENUE

20.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(1) because Meta and Instagram LLC are headquartered and reside in the Northern District.

21.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims (that is, Meta's development, production, and distribution of Instagram) occurred there.

## DIVISIONAL ASSIGNMENT

22.     Assignment to the San Francisco Division is proper under Civil Local Rules 3-2(c) and 3-2(d) because Meta is headquartered in San Mateo County and a substantial part of the

events or omissions giving rise to these claims (that is, Meta's development, production, and distribution of Instagram) occurred there.

## SUBSTANTIVE ALLEGATIONS

**I.      Instagram**

23.      Instagram is a social media application or "app."

24.      Meta promotes Instagram as a "Bringing you closer to the people and things you love … We foster a safe and inclusive community where people can express themselves, feel closer to anyone they care about and turn a passion into a living."[5]

25.      Instagram has more than one billion monthly active users worldwide, and roughly 160 million users in the United States.

26.      Most Instagram users, including M.H., download, install, and run Instagram on mobile devices like iPhones.

27.      Instagram users use the app to view other users' photos and videos, and share their photos and videos with other users. These photos and videos appear on other users' Instagram "feeds," which are virtually bottomless scrollable lists of content.

28.      The presentation of content (photos, videos, and ads) that appears on users' Instagram feeds is generated by algorithms designed by Meta. Meta's algorithms are not based exclusively on user requests or inputs. Instead, the algorithms combine user-inputted profile data with data collected by Meta to make assumptions and predictions about what will keep the user engaged, and then make specific recommendations. Meta's design dictates the way content is presented, such as its ranking and prioritization.[6]

29.      Meta does not charge a fee to use Instagram. Instead, Meta makes money from Instagram by collecting data on Instagram users, and deploying that data to serve its users targeted advertising.

---

[5] https://about.meta.com/technologies/instagram/.

[6] *See* Adam Mosseri, *Shedding More Light on How Instagram Works*, Instagram (June 8, 2021), https://about.instagram.com/blog/announcements/shedding-more-light-on-how-instagram-works.

30.     Meta's business model requires creating and maintaining high levels of user "engagement" with its products—that is, keeping users on its apps for as long as possible as often as possible. The more time users spend on its apps, the more advertising they see, and the more money Meta makes.

31.     Meta's business model is quite lucrative. In 2019, Meta reported nearly $70 billion in advertising revenues across all its advertising platforms. Instagram accounted for approximately $20 billion of this total.

32.     Instagram is particularly popular among young people. More than 70 percent of the app's billion users are under the age of 35. More than 40 percent are under the age of 23. In the United States, more than 70 percent of people aged 18 to 29 have active Instagram accounts. About 22 million U.S. teenagers use Instagram daily.

33.     Instagram's popularity among young people is no accident. It is the result of Meta's deliberate efforts to target a young audience.

34.     Reaching young audiences is a priority for advertisers and marketers. It is therefore a priority for social media companies, like Meta, that sell advertising.

35.     Meta sees Instagram as one of the keys to its ability to attract and retain young audiences. According to a Meta presentation from 2019, "Instagram is well positioned to resonate and win with young people. . . . There is a path to growth if Instagram can continue their trajectory."[7]

36.     Meta acquired Instagram and its developer (then a two-year-old start-up company with 13 employees and no revenue) for $1 billion in 2012. The acquisition was primarily motivated by Meta's intent to make up for declines in young users of its flagship social media product, Facebook.

37.     In a race against other social media apps for teenage users, Meta began adding features to Instagram it thought were particularly likely to attract and retain such users. The net result of these changes for Instagram users was an overriding focus on attractive self-presentation in comparison to others.

---

[7] Wells *et al.*, *supra*.

38.     These additional features designed and promoted by Instagram included "filters" that allowed users to edit their own images, support for video posts, and tools for "touching up" photos of faces.[8]

39.     Believing that the surest way to maintain a teenage audience is to recruit a pre-teenage audience, Meta has also targeted "tweens," children between the ages of 10 and 12, as a "valuable but untapped audience."[9]

40.     Meta has a written policy that Instagram users must be at least 13 years old. But Meta has strong business incentives not to enforce that policy and, indeed, it is laxly enforced. In the United States in 2020, more than 10 percent of children between the ages of 9 and 11 reported using Instagram. In 2021, popular Instagram personality JoJo Siwa told Adam Mosseri, the Meta executive in charge of Instagram, that she had been using Instagram since she was 8 years old, that part of her Instagram audience is younger than 13, and that young children are attracted by the kind of content Instagram's algorithms presents to its users. Mosseri responded that he "[didn't] want to hear about it" and asserted that, because young users can "lie about their age now," Meta should design a version of Instagram specifically targeted to "kids."[10]

41.     Instagram devastates the mental and physical health of many of its young users, especially girls and young women like M.H.

42.     Instagram use is positively correlated with eating disorders and body dysmorphia, according to recent independent literature reviews.[11]

43.     According to young users themselves, Instagram use becomes an "obsession" despite the fact that, "[e]very time I feel good about myself, I go over to Instagram, and then it all

---

[8] *Id.*

[9] Georgia Wells & Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show*, WALL STREET JOURNAL (Sept. 28, 2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667.

[10] *Id.*

[11] Saul *et al.*, *Adolescent Eating Disorder Risk and the Social Online World: An Update*, CHILD AND ADOLESCENT PSYCHIATRIC CLINICS OF NORTH AMERICA 31, 167–77 (2022); Faelens *et al.*, *The relationship between Instagram use and various indicators of mental health*, COMPUTERS IN HUMAN BEHAVIOR REPORTS 4 (2021).

goes away" Using Instagram feels like a "kick in the gut." Young users are relentlessly "pounded with" content that undermines their self-image and self-worth "every time I go on Instagram."[12]

44.     According to Meta's own researchers, Instagram "make[s] body image issues worse for one in three teen girls." One in five teens reported that Instagram "makes them feel worse about themselves." And roughly one in ten teen users reporting suicidal thoughts traced them to Instagram, as did two in five teen users who reported feeling "unattractive." Teens "consistently" and *without prompting* blamed Instagram "for increases in the rate of anxiety and depression."[13]

45.     Also according to Meta's own researchers, young users are not capable of controlling their Instagram use to protect their health. Such users "often feel 'addicted' and know that what they're seeing is bad for their mental health but feel unable to stop themselves."[14]

46.     Meta knew (or should have known) about the risks of Instagram use in young users because its own researchers uncovered and presented them to the company, as set forth above.

47.     In public, however, Meta has repeatedly denied these risks. Meta CEO Mark Zuckerberg testified before Congress in 2021 that the "research that we've seen is that using social apps to connect with other people can have positive mental-health benefits." Instagram head Mosseri told reporters the same year that he had seen research suggesting Instagram's negative effect on young users' mental health is "quite small."[15]

48.     Instagram harms young users' mental and physical health with a two-step mechanism. *First*, the mechanism hooks and retains young users by offering an "obsessive" experience, which young users are incapable of controlling despite their desire to.

49.     Like other addicting products, social media apps like Instagram hook their users by disrupting their brains' reward circuitry.

---

[12] Wells *et al.*, *supra*.

[13] *Id.* (emphasis added).

[14] *Id.*

[15] *Id.*

50.     Humans by nature seek out and derive pleasure from successful social interactions. Experiencing a successful social interaction causes the release in the brain of a chemical called dopamine, a neurotransmitter that helps regulate feelings of pleasure and pain. When dopamine is released in response to a stimulus, a person experiences a feeling of pleasure or reward, and is driven to seek out the stimulus again. This association between stimulus and reward grows stronger each time it is activated.

51.     Repeated spikes of dopamine over time may cause "neuroadaptation" in the brain of the person experiencing them. This means that the person's brain starts accounting for the increased dopamine levels caused by external stimuli by "downregulating" its normal production of and sensitivity to dopamine. As a result, the person's brain requires more and more of the stimulus to enjoy the same feeling of reward. Conversely, if the stimulus is withheld, the person may experience pain or feelings of anxiety and depression. The person's neurological circuitry has been thus rewired by the addicting product.

52.     Young users are particularly vulnerable to addiction, and find it particularly difficult to exercise the self-control required to regulate their use of social media apps like Instagram.

53.     Adolescents are known for their low self-control. Their capacity for self-regulation has been described as "all gasoline, no brakes, and no steering wheel."[16] This may be because the brain's reward circuitry, described above, develops more quickly than the brain's processes for self-control and rational decision-making, such that the motivation to seek pleasure outstrips the developing brain's capacity to think rationally.

54.     Self-regulation among other things allows people to "delay gratification," that is, to postpone an immediate reward for a better reward later. Adolescents' low capacity for self-regulation means they are particularly vulnerable to the immediately pleasurable, but ultimately harmful, effects of the repeated dopamine spikes caused by an addicting external stimulus.

---

[16] Carl C. Bell & Dominica F. McBride, *Affect Regulation and Prevention of Risky Behaviors*, JAMA (2010), doi:10.1001/jama.2010.1058.

55.     Adolescents are especially vulnerable to long-term harm from addiction because adolescence is a critical stage in brain development and addiction disrupts brain development.

56.     Instagram has numerous features designed to maximize user engagement, that is, to keep users on the app for as long as possible. These features, in part, exploit the neurophysiological mechanisms described above.

57.     "Unlike a magazine, television show, or video game," Instagram only rarely prompts its users to take a break from using Instagram by using "stopping cues."[17]

58.     As described above, an Instagram user's feed is designed to be a virtually bottomless, scrollable list of content without any natural stopping point. This feature allows and encourages users to use the app for unlimited periods of time.

59.     As initially designed, content on users' Instagram feeds appeared in chronological order, with newer posts displayed above older ones. After acquiring Instagram, Meta redesigned the feed to prioritize what it predicted would be the most "engaging" content—that is, content most likely to keep the user on the app for the longest period of time. As noted by Meta CEO Zuckerberg himself, the most "engaging" content is at least as often harmful or undesirable as it is beneficial or desirable.[18]

60.     Instagram has a feature called "Stories," which are short-lived photo or video posts accessible for only 24 hours. This feature encourages constant, repeated, and compulsive use of the app, so that users do not miss out on any Stories content before it disappears.

61.     Like users' feeds, the presentation of content in a user's Stories is generated by an algorithm designed by Meta to maximize the amount of time a user spends on the app.

62.     Instagram also has a feature called "Explore," which displays content posted by users not previously "followed." The content in "Explore" is selected and presented by an algorithm designed by Meta to maximize the amount of time a user spends on the app.

---

[17] Zara Abrams, *How Can We Minimize Instagram's Harmful Effects?*, Am. Psych. Ass'n (Dec. 2, 2021), https://www.apa.org/monitor/2022/03/feature-minimize-instagram-effects.

[18] Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, Meta (2018), https://www.facebook.com/notes/751449002072082.

63.     The Explore feature may be scrolled endlessly; its algorithm will continually generate new recommendations for the user. This feature allows and encourages users to use the app for unlimited periods of time.

64.     Instagram has another feature called "Reels," which, like Explore, presents content posted by users not previously followed. Unlike Explore, Reels presents only short video posts. These videos play automatically, without input from the user, encouraging the user to stay on the app for indefinite periods of time.

65.     Reels content is selected and presented by an algorithm designed by Meta to maximize the amount of time a user spends on the app.

66.     Each new post that appears on a user's feed, Stories, Explore, or Reels functions as a new, dopamine-producing social interaction in the user's brain.

67.     Instagram is designed to allow and encourage other users to "like" a user's post or to comment on it.

68.     Likes and comments on a user's posts function as an even stronger dopamine-producing stimulus than does seeing new posts from other users. This in turn drives users to generate content they expect will generate many likes and comments.

69.     These features function in concert, as content users know is popular provides the model for content users generate themselves. For example, a teenage girl may be served a popular (i.e., much "liked" and commented upon) post from a model or fitness personality. She may then feel pressure to generate similar content herself in an attempt to garner the same positive social feedback.

70.     When not in use, Instagram deploys a number of strategies to pull the user back in. Users will be notified by text messages, e-mails, and other alerts that new content is available on the app or that their own content has generated reactions.

71.     These notifications are minutely calibrated to exploit users' neurophysiology. For example, Instagram will withhold notifications of individual "likes" to deliver a large number of them all at once after a seeming period of inactivity. This is calculated to generate a feeling of

disappointment by its users' perceived lack of engagement with their content from others followed by a sudden inrush of dopamine in its users' brains.

72.     In sum, as former Meta employee Frances Haugen has described them, Instagram traps young users in an endless cycle of "little dopamine loops."[19]

73.     *Second*, once young users are captured by the impact of Instagram's design on their own psychology and neurophysiology, Instagram's algorithms relentlessly bombard them with content that undermines their self-image and self-esteem, leading in turn to harms to mental and physical health like anorexia, bulimia, depression, and anxiety.

74.     It is Instagram's presentation of this content that is primarily responsible for harming young users' mental and physical health. According to Meta's researchers, "[a]spects of Instagram exacerbate each other to create a perfect storm." As Meta's researchers also concluded, Instagram is uniquely harmful relative to its peers: "social comparison," or peoples' assessment of their own value relative to others', is "worse on Instagram" for teenagers than on other social media platforms.[20]

75.     As one young woman described the algorithms' barrage, "I mean, you can like one picture with a girl doing her makeup. And then all of a sudden, you get 10 more pictures with different girls all looking perfect. And it's just like, I only liked one picture."[21]

76.     Young users are particularly vulnerable to the harms of feelings of poor social comparison. Compared to younger children and adults, adolescents are commonly preoccupied with their perceived standing and reputation among their peers, and are quicker to suffer ill effects from feelings of rejection, ostracization, or unpopularity.

**II.     M.H.'s Instagram Use**

77.     Before M.H. started using Instagram, she was a happy and healthy child.

---

[19] Allison Slater Tate, *Facebook whistleblower Frances Haugen says parents make 1 big mistake with social media*, Today (Feb. 7, 2022), https://www.today.com/parents/teens/facebook-whistleblower-frances-haugen-rcna15256.

[20] Wells *et al.*, *supra*.

[21] Laurel Wamsley, *Teens say Facebook's addictive Instagram app makes them anxious*, NPR (Oct. 10, 2021), https://www.npr.org/2021/10/10/1044830216/teens-say-facebooks-addictive-instagram-app-makes-them-anxious.

1

78.     M.H. started using Instagram in December 2016.

2

79.     Soon after M.H. starting using Instagram, because it is designed to capture and

3

retain the attention of young users, as explained above, M.H.'s Instagram use quickly

4

metastasized.

5

80.     Within a year, M.H. was using Instagram for up to four hours per day, every day,

6

at a crucial developmental period in her life.

7

81.     During these periods, Instagram specifically targeted M.H. with a seemingly

8

unending series of posts and advertisements to retain her attention and keep her on the site,

9

including messaging and imagery that promoted unrealistic body images and extreme weight loss;

10

glamorized harmful relationships to food, dieting, and exercise; and drastically undermined

11

M.H.'s self-image and self-worth.

12

82.     Among the barrage of posts and advertisements Instagram targeted at M.H. to keep

13

her engaged with Instagram were ones expressly promoting anorexia, or "pro-ana."

14

83.     Instagram aimed and delivered most of the above posts to M.H. without M.H.'s

15

taking any action to find them and despite efforts to remove them from her feed.

16

84.     Because Meta intentionally hooked M.H. to its product Instagram and targeted her

17

with dangerous messaging to keep her engaged, M.H. was diagnosed with anorexia at the age of

18

15, and entered in-patient treatment. She also received treatment and counseling for her anorexia

19

from her pediatricians, therapist, and clinical dietician.

20

85.     M.H. was also diagnosed with depression and anxiety.

21

86.     Seeing that Instagram was harming their daughter, Mr. Hemmer, in consultation

22

with M.H. and M.H.'s health care providers, have attempted to limit his daughter's Instagram use.

23

87.     Instagram continues to cause M.H. to suffer from a life-threatening eating disorder

24

and associated conditions.

25

88.     Meta did not warn M.H., her father, or the public that Instagram is harmful. To the

26

contrary, Meta has maintained that its products are safe and even beneficial to young people.

27

28

## COUNT I: STRICT PRODUCTS LIABILITY FOR DEFECTIVE DESIGN

89.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

90.     Mr. Hemmer seeks damages for himself and for M.H. based on a claim that M.H. was injured by Meta's product Instagram, which is a defective and unreasonably dangerous product in the way it was designed.

91.     Instagram is a product, for which strict liability may be imposed if defective, because it is a mass produced, standardized, and generally available software application.

92.     There is a design defect in Instagram because, as a result of its design, Instagram failed to perform as safely as an ordinary user would expect when it was used by M.H. in a manner reasonably foreseeable to Meta, and because, at the time Instagram was designed, a safer alternative design was available that was technically and economically feasible under the circumstances.

93.     The design defect makes Instagram unreasonably dangerous because it makes Instagram more dangerous than an ordinary user would expect considering Instagram's characteristics, uses of Instagram that were foreseeable to Meta, and lack of any instructions or warnings; and because M.H. did not have actual knowledge, training, or experience sufficient to know the dangers of Instagram or from its use.

94.     The design defect in Instagram was present the time Meta distributed Instagram to M.H.

95.     The design defect in Instagram was a cause of M.H.'s injuries because it produced them directly, or set in motion events that produced them, in a natural and continuous sequence, and the design defect could be foreseen by a reasonable person to produce a harm of the same general nature.

## COUNT II: STRICT PRODUCTS LIABILITY FOR FAILURE TO WARN

96.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

97.     Mr. Hemmer seeks damages for himself and for M.H. based on a claim that M.H. was injured by Meta's product Instagram, which is defective and unreasonably dangerous because it lacked an adequate warning.

98.     Instagram is a product, for which strict liability may be imposed if defective, because it is a mass produced, standardized, and generally available software application.

99.     Instagram is not accompanied by any warning of its risks to young users like M.H.

100.    Meta's failure to adequately warn young users like M.H. makes Instagram unreasonably dangerous because it makes Instagram more dangerous than an ordinary user would expect considering Instagram's characteristics, and uses of Instagram foreseeable to Meta; and because M.H. did not have actual knowledge, training, or experience sufficient to know the danger from Instagram or from its use.

101.    Meta's failure to adequately warn young users like M.H. was a cause of M.H.'s injuries because she and/or her father would have heeded the warning if it had been given, and she would not have used Instagram in the ways that she did, which harmed her mental and physical health.

## COUNT III: NEGLIGENCE

102.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

103.    Mr. Hemmer seeks to recover damages based on a claim that M.H. was injured due to Meta's negligence in failing to use reasonable care in designing Instagram to eliminate any unreasonable risk of foreseeable injury.

104.    Meta had a duty to use reasonable care (that is, to do what a reasonably careful social media product designer would do under similar circumstances) in designing Instagram to eliminate any unreasonable risk of foreseeable injury to those, like M.H., who Meta knew or should have expected would be endangered by Instagram.

105.    Meta failed to use reasonable care in designing Instagram to eliminate any unreasonable risk of foreseeable injury to those, like M.H., who Meta knew or should have expected would be endangered by Instagram.

106. Meta's failure to use reasonable care in designing Instagram was a cause of M.H.'s injuries because it produced them directly, or set in motion events that produced them, in a natural and continuous sequence, and the design defect could be foreseen by a reasonable person to produce a harm of the same general nature.

**COUNT IV: FRAUDULENT CONCEALMENT; FRAUDULENT NONDISCLOSURE**

107. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

108. Mr. Hemmer seeks damages for himself and for M.H. based on a claim that M.H. was injured due to Meta knowingly concealing an important fact it had a duty to disclose.

109. Meta had a duty to communicate the risks of Instagram use in young users like M.H. because it makes money from such use through advertising, was in a better position to know the risks of Instagram use in young users than M.H. was, and should have known that young users like M.H. and/or her father would trust it to know whether Instagram was safe for them to use.

110. Meta knew the risks of Instagram use to young users like M.H.

111. It would have been important to M.H. and/or her father to know the risks of Instagram use in young users like her.

112. If Meta had not concealed the risks of Instagram use in young users like her, M.H. would not have used Instagram in the ways that she did, which harmed her mental and physical health.

**COUNT V: FRAUDULENT MISREPRESENTATION**

113. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

114. David Hemmer seeks damages for himself and for M.H. based on a claim that M.H. suffered a loss as a result of Meta's false, material representations.

115. Meta failed to disclose the risks of Instagram use in young users like M.H., while targeting such users in the way it designed and promoted Instagram, and falsely representing to regulators and the public that Instagram was safe for young users like M.H.

116.    The net impression on the general population of Meta's representations and omissions about the risks of Instagram use in young users like M.H. was false, misleading and deceptive.

117.    Meta knew that its representations that Instagram was safe for young users like M.H. were false and made the representations with the intention that young users like M.H. would rely upon it.

118.    It would have been important to M.H. and/or her father to know the truth about the risks of Instagram use to young users like her.

119.    If Meta had not made false statements, M.H. would not have used Instagram in the ways that she did, which harmed her mental and physical health and caused her to suffer damages.

### COUNT VI: NEGLIGENT MISREPRESENTATIONS

120.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

121.    Mr. Hemmer seeks damages for himself and for M.H. based on a claim that M.H. suffered a loss as a result of Meta's negligent misrepresentations.

122.    Meta failed to disclose the risks of Instagram use in young users like M.H., while targeting such users in the way it designed and promoted Instagram, and falsely representing to regulators and the public that Instagram was safe for young users like M.H.

123.    The net impression on the general population of Meta's representations and omissions about the risks of Instagram use in young users like M.H. was false, misleading and deceptive.

124.    Meta had a duty to communicate the risks of Instagram use in young users like M.H. because it makes money from such use through advertising, was in a better position to know the risks of Instagram use in young users than M.H. was, and should have known that young users like M.H. and/or her father would trust it to know whether Instagram was safe for them to use.

125.    Meta negligently made the misrepresentations by breaching its duty owed to young users including M.H.

1   126.   It would have been important to M.H. and/or her father to know the truth about the

2   risks of Instagram use to young users like her.

3   127.   If Meta had not made false statements, M.H. would not have used Instagram in the

4   ways that she did, which harmed her mental and physical health and caused her to suffer

5   damages.

6   **COUNT VII: VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

7   *(Cal. Bus. & Prof. Code § 17200, et seq.)*

8   128.   Plaintiff incorporates by reference each preceding and succeeding paragraph as

9   though set forth fully at length herein.

10   129.   Mr. Hemmer seeks damages for himself and for M.H. based on a claim that M.H.

11   suffered a loss as a result of Meta's unfair competition in violation of the California Unfair

12   Competition Law.

13   130.   Meta engaged in fraudulent and deceptive business practices by failing to disclose

14   the risks of Instagram use in young users like M.H., while targeting such users in the way it

15   designed and promoted Instagram, and representing to regulators and the public that Instagram

16   was safe for young users like M.H.

17   131.   The net impression on the general population of Meta's representations and

18   omissions about the risks of Instagram use in young users like M.H. was likely misleading and

19   deceptive.

20   132.   It would have been important to M.H. and/or her father to know the truth about the

21   risks of Instagram use in young users like her.

22   133.   Meta engaged in unfair business practices by promoting and designing Instagram

23   to attract and capture such users' engagement, while knowing their mental and physical health

24   was thereby harmed, for no other reason that its own advertising revenues, offending established

25   public policy.

26   134.   If Meta had not competed unfairly, M.H. would not have used Instagram in the

27   ways that she did, which harmed her mental and physical health.

28

COMPLAINT

**PRAYER FOR RELIEF**

135.    Plaintiff asks the Court to enter a judgment awarding him:

        a.     compensatory damages in an amount to be determined at trial,

        b.     punitive damages in an amount to be determined at trial,

        c.     pre- and post-judgment interest as permitted by law,

        d.     costs of suit,

        e.     reasonable attorneys' fees, and

        f.     all other just and proper relief.

**JURY DEMAND**

136.    Plaintiff demands a trial by jury on all issues so triable.

Dated: January 5, 2023             Respectfully submitted,

                                      */s/ Lexi J. Hazam*

                                        Lexi J. Hazam (State Bar No. 224457)
lhazam@lchb.com
Tiseme G. Zegeye
tzegeye@lchb.com
Nigar A. Shaikh
nshaikh@lchb.com
Ian R. Bensberg
ibensberg@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Jason L. Lichtman
jlichtman@lchb.com
Kelly K. McNabb
kmcnabb@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Neal A. Roberts
nroberts@protectuslaw.com
Steve Vale
svale@protectuslaw.com
Tristan Gillespie
Gillespie.tristan@gmail.com
PROTECTUS LAW
1025 Connecticut Avenue NW Suite 1000
Washington, DC 20036
Telephone: (202) 810-1300

*Attorneys for Plaintiff David Hemmer*

2730148.2

COMPLAINT